## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                                                    CR 13-434 RB

JOSE LEONEL PEREZ-MOLINA,

      Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION
## REGARDING DEFENDANT'S MOTION TO SUPPRESS

Defendant Jose Leonel Perez-Molina has been charged with violating 18 U.S.C. § 1326(a) and (b) by knowingly reentering the United States despite having been deported, excluded, and removed from the United States while an Order of Exclusion, Deportation and Removal was outstanding. (Doc. 1.) Perez-Molina filed a Motion to Suppress certain evidence on May 2, 2013 (Doc. 23), and the Government filed a response on May 16, 2013 (Doc. 28). This matter was then referred to me to make findings of fact, conduct legal analysis, and recommend a final disposition. (Doc. 29.) I held a hearing on the motion on June 5, 2013, at which time I admitted evidence from both parties and heard testimony from New Mexico State Police ("NMSP") Officer Edgar Pio. Having fully considered the pleadings, the hearing testimony, and the facts and evidence before me, I recommend that the Court deny Perez-Molina's Motion to Suppress in full.

**PROPOSED FINDINGS OF FACT**

Federal Rule of Criminal Procedure 12(d) provides that when factual issues are involved in deciding a motion, the Court must state its essential findings on the record. Based on the evidence presented at the suppression hearing, including testimony from Officer Pio and video from his patrol car (*see* Gov't Ex. 3), I propose the following factual findings:

1.   At approximately 6:00 p.m. on November 26, 2012, Officer Pio, an officer with approximately five years of experience with the NMSP, was traveling north on New Mexico State Highway 187 near mile marker 13 in Sierra County, New Mexico. While doing so, he observed a white Ford Lincoln traveling southbound. Using a Golden Eagle radar, he determined that the Lincoln was going approximately sixty-five miles per hour in a fifty-five-mile-per-hour zone.

2.   Officer Pio engaged his emergency lights and equipment, turned his patrol car around, and pulled over the vehicle, which was driven by Jose Chairez. (0:55.)[1]

3.   Upon approaching the vehicle on the driver's side, Officer Pio observed three males in the vehicle, including Chairez in the driver's seat, Perez-Molina in the front passenger seat, and another passenger in the rear of the vehicle. The night was dark, and Pio could not determine the ages of the vehicle occupants with any certainty, but he testified that at the time he thought they could be anywhere from eighteen to twenty-five years old. He also testified that he could smell alcohol in the vehicle.

4.   Officer Pio asked Chairez to step out of the vehicle while he reviewed Chairez's driver's license. (3:25.) While Chairez was near the patrol car, Officer Pio asked him for his and his

---

[1] Numbers indicate the time stamp of the video recording admitted as Government Exhibit 3. The times do not refer to the time of day.

passenger's ages; he answered truthfully that he was almost twenty-three, and he further stated that one of his passengers was twenty-one and the other was twenty-three. (3:53.)

5.   Officer Pio next asked how much beer was in the vehicle and how much Chairez had drunk. (4:19.) Chairez stated that there were six beers in the car and admitted that he had consumed one beer himself. (*Id.*) As Officer Pio later testified, Chairez did not appear to have bloodshot eyes, slurred speech, or any other indicators of impairment from alcohol consumption.

6. On Officer Pio's instructions, Chairez went to his car to retrieve his passengers' identification. (5:38.) Chairez returned with only one identification card, saying that only one passenger had any identification on him. (6:25.)

7.   Officer Pio issued a speeding citation to Chairez, admitted as Government Exhibit 1. (8:40.) He then ordered Chairez to gather any open beer containers in Chairez's vehicle and bring them to him. (8:43.) Chairez returned with a single open beer can, which he insisted was the only open container in the vehicle. (9:22.) When Officer Pio asked who had been drinking that beer, Chairez stated that he was the only one doing so. (9:40.) Officer Pio then issued a second citation to Chairez, admitted as Government Exhibit 2, this time for violating the state's open container statute. (13:03.)

8.   Officer Pio instructed Chairez to return to his vehicle and send the back-seat passenger to the patrol car. (*Id.*) That passenger approached (13:50), and Officer Pio briefly checked his identification (14:04). Officer Pio then asked who the other passenger (Perez-Molina) was and why that man did not have any identification. (14:07.) The passenger identified Perez-Molina as a friend and said that Perez-Molina's identification was at his house. (*Id.*) Officer Pio then told the passenger to return to Chairez's vehicle and send Perez-Molina to the patrol car. (14:23.) This encounter lasted approximately half a minute.

3

9.   Perez-Molina approached Officer Pio's patrol car at around 6:13 p.m. (14:36.) At Officer Pio's questioning, Perez-Molina identified himself as Jose L. Perez (14:42) and provided his date of birth (14:56) and social security number (15:20). Perez-Molina stated that his father had his New Mexico identification card with him. (15:03.)

10. Officer Pio entered the information provided by Perez-Molina into a law enforcement database, and he soon discovered a possible "hit" in the system. The record returned by the database (*see* Defense Ex. A) stated that Perez-Molina was previously deported for committing an aggravated felony. The record also listed "Jose Leonel Perez" and "Jose Leonel Molina" as aliases. (*See id.*) The query results instructed reviewing officers to immediately contact the Bureau of Immigration and Customs Enforcement ("ICE") for confirmation of the database hit. However, the record did not state that the subject should be detained if encountered.

11. After noting the database hit, Officer Pio confirmed Perez-Molina's date of birth (16:00), middle initial (*id.*), and social security number (16:27), and at his questioning Perez-Molina described and showed one of his tattoos (17:00).

12. As Officer Pio attempted to hail his police dispatcher on the radio (17:27), Perez-Molina asked if Officer Pio wanted him to go get his identification from his father (17:49). Officer Pio advised that Perez-Molina could call his father and ask him to bring the identification. (*Id.*) Perez-Molina stated that his father was working and asked if he could go get it himself; Officer Pio responded that he should ask his friends to get it for him. (17:56.)

13. While Officer Pio continued to attempt radio contact with his dispatcher, he asked Perez-Molina for his full middle name, which Perez-Molina said was Leonel. (18:34.)

14. Officer Pio was eventually able to reach his dispatcher. (19:00.) The dispatcher found no hits in her database for anyone with the names "Jose Perez" or "Jose L. Perez" and with Perez-

Molina's given birthday. (19:55, 20:18.) Although Officer Pio informed her that his database query had revealed a possible hit (20:25), a third search by the dispatcher again revealed no information (21:00).

15. As Perez-Molina spoke with someone on his cellular phone, Officer Pio relayed Perez-Molina's social security number to his dispatcher. (21:27, 21:47.) After running her search with this information, the dispatcher reported a hit on Perez-Molina, who was listed as a previously deported felon. (22:14-23:01.)

16. As Perez-Molina appeared to overhear the dispatcher's statements, he became visibly and audibly agitated and started moving away from the patrol car. (22:59.) Officer Pio noticed this and instructed Perez-Molina to "hold on" (23:04); Perez-Molina stated that he was just going to get his identification, but Officer Pio again told him to "hold on" (23:06).

17. At that point, approximately 6:21 p.m., Perez-Molina ran from Officer Pio's patrol car, jumped into the front passenger seat of Chairez's vehicle, and shut the door. (23:12.) Officer Pio then heard Perez-Molina order Chairez in Spanish to "step on it." (23:19.)

18. Officer Pio immediately pursued Perez-Molina on foot (23:17), grabbed Perez-Molina's arm as he sat in the vehicle, and ordered Chairez not to drive off and Perez-Molina to exit the vehicle (23:21). Perez-Molina initially refused to leave the vehicle and demanded that Officer Pio let him go, claiming that he was leaving to get his identification. (23:26.) After refusing to cooperate for about fifteen seconds, Perez-Molina allowed himself to be handcuffed and removed from the vehicle. (22:38.)

19. Officer Pio placed Perez-Molina in the back of his patrol car. (23:51.) When Officer Pio accused him of "being stupid" and asked him why he ran, Perez-Molina insisted that he had not been fleeing and that he had merely been leaving to go get his identification. (23:47.)

20. At about 6:25 p.m., Officer Pio asked Chairez and his other passenger several questions about Perez-Molina, then advised them that they were free to leave. (26:30.)

21. Officer Pio later testified that he believed his department's policy was to detain any previously deported felon until contact is made with ICE personnel, then to turn him or her over to the appropriate authorities. Accordingly, after patting down Perez-Molina for weapons (27:35), Officer Pio informed Perez-Molina that he was detaining him and that he was going to take him to a nearby Customs and Border Patrol (CBP) checkpoint to get his fingerprints (28:15). He also asked Perez-Molina why he had not given more complete information earlier, but Perez-Molina did not respond. (28:27.) He then told Perez-Molina that immigration enforcement was not his job and that if Perez-Molina "had been honest with me, I'd have let you go." (28:33.)

22. At approximately 6:28 p.m., Officer Pio began driving Perez-Molina towards the CBP checkpoint at his supervisor's instructions. (29:35.) As he was driving to the checkpoint, personnel from ICE contacted Officer Pio and confirmed Perez-Molina's physical characteristics. At 6:57 p.m. CBP personnel authorized Officer Pio to transport Perez-Molina to the checkpoint, where he turned Perez-Molina over to personnel working there.

23. At no point during any of his time with Perez-Molina did Officer Pio read him his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).

24. At the suppression hearing, Officer Pio testified that he had been attempting to determine the ages of Perez-Molina and the other passenger because he suspected a violation of New Mexico's criminal statute prohibiting a minor from buying, attempting to buy, receiving, possessing, or permitting himself to be served with alcoholic beverages. He claimed that he ran Perez-Molina's information through his database to confirm his age because Perez-Molina was not carrying any identification on him.

6

25. Perez-Molina was born on September 10, 1989, making him twenty-three years old at the time of the traffic stop and close to twenty-four on the date of the suppression hearing. (*See* Defense Ex. A.) His appearance at the suppression hearing was consistent with his age, although a reasonable observer could mistake him to be as young as nineteen or twenty.

### LEGAL STANDARDS AND ANALYSIS

Perez-Molina moves to suppress evidence of his identification, including his responses to Officer Pio's questions and his Alien File and fingerprints. (Doc. 23 at 1.) In support of his motion, he contends that (1) his continued detention was not justified by any reasonable suspicion that Perez-Molina was involved in criminal activity, and (2) his statements to Officer Pio must be excluded because Officer Pio failed to read Perez-Molina his *Miranda* rights before eliciting those statements. The United States responds that Perez-Molina's detention was justified at all times and that his statements were not the product of a custodial interrogation. (Doc. 28.)

### I.      Officer Pio's Seizure of Perez-Molina

The Fourth Amendment protects citizens from "unreasonable searches and seizures" by government officials. U.S. CONST. amend IV; *see, e.g.*, *United States v. Burleson*, 657 F.3d 1040, 1044-45 (10th Cir. 2011). The burden of proving that a seizure is reasonable lies with the Government, *see United States v. De La Cruz*, 703 F.3d 1193, 1196 (10th Cir. 2013) (citation omitted), though ultimately "the burden is on the defendant to prove that the challenged seizure was illegal," *United States v. Rosborough*, 366 F.3d 1145, 1148 (10th Cir. 2004).

As an initial matter, it is apparent that Perez-Molina was seized for Fourth Amendment purposes at all relevant times. The initial stop of Chairez's vehicle, which would be considered a "routine traffic stop," constituted an investigative detention and was therefore effectively

governed by the Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1 (1968). *See United States v. Rodriguez-Rodriguez*, 550 F.3d 1223, 1226 (10th Cir. 2008); *see also Brendlin v. California*, 551 U.S. 249, 256-57 (2007) (recognizing that a passenger is seized when a vehicle he is riding in is subject to an investigative stop). This seizure of everyone in Chairez's vehicle, including Perez-Molina, continued "[f]or the duration of [the] traffic stop." *See Arizona v. Johnson*, 555 U.S. 323, 326 (2009) (citing *Brendlin*, 551 U.S. 249). The traffic stop ended only after Perez-Molina had already been handcuffed and placed in the back of Officer Pio's patrol car, and the Government acknowledged at the suppression hearing that Perez-Molina was effectively under arrest at that point.

Because Perez-Molina's detention up until his arrest was governed by *Terry*, the seizure was only reasonable if it was justified by a reasonable articulable suspicion that Perez-Molina had committed or was about to commit a crime. *See De La Cruz*, 703 F.3d at 1196 (citing *Florida v. Royer*, 460 U.S. 491, 498 (1983) (plurality)). Reasonable suspicion is "something more than an inchoate and unparticularized suspicion or hunch," but it "is considerably less than proof by a preponderance of the evidence or that required for probable cause." *United States v. Chavez*, 660 F.3d 1215, 1221 (10th Cir. 2011) (citation omitted). Reasonable suspicion is measured by the totality of the circumstances, using an objective standard; the detaining officer's subjective beliefs and intentions are irrelevant. *See id.* at 1221-22 (citation omitted).

In the Tenth Circuit, the reasonableness of an investigative stop is examined under a two-step inquiry. *Lundstrom v. Romero*, 616 F.3d 1108, 1120 (10th Cir. 2010). First, a court must assess whether the detention was justified at its inception. *Id.* (citation omitted). If the initial suspicion dissipates at some point, a court must determine whether any "additional detention [wa]s supported by [new] reasonable suspicion of criminal activity," provided that reasonable

suspicion existed at all stages of the detention. *De La Cruz*, 703 F.3d at 1198 (citation omitted). Second, the court must evaluate whether the officer's actions were reasonably related in scope to the circumstances that justified the detention. *Lundstrom*, 616 F.3d at 1120 (citation omitted).

A. *Officer Pio's Questioning of Perez-Molina Was Not Justified by the Initial Traffic Stop.*

There does not appear to be any dispute that Officer Pio was justified in pulling over Chairez's vehicle, instigating the investigatory stop, and (at least initially) detaining its occupants. Officer Pio's testimony that he observed Chairez traveling ten miles per hour over the speed limit was uncontested, and "a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation." *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995). Accordingly, the next question is whether Officer Pio's continued detention and questioning of Perez-Molina, which occurred after he had issued citations to Chairez, were reasonably related in scope to the circumstances that justified pulling over Chairez's vehicle.

"Generally, an investigative detention must last no longer than is necessary to effectuate the purpose of a stop." *United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir. 1999) (quoting *Royer*, 460 U.S. at 500 (plurality opinion)) (internal quotation marks omitted). "When a driver has produced a valid license and proof of entitlement to operate the vehicle, an officer may issue a citation, but then usually must allow the driver to proceed without further delay or questioning." *Id.* (citing *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998)). In this instance, Officer Pio's questioning of Perez-Molina occurred after Chairez had produced the necessary documents and after Officer Pio had issued speeding and open-container citations to Chairez. He only sought to question Perez-Molina further after the citations had been issued. By that point, however, officers are generally required to end a routine traffic stop and let the vehicle and its passengers be on their way. Accordingly, Officer Pio's continued detention of Perez-

Molina and the other vehicle occupants after issuing the citations exceeded the scope of permissible actions related to the original purpose of the investigative stop.

It is true that the Tenth Circuit has held that an officer may, in some situations, request identifying information from passengers in a lawfully stopped vehicle and run background checks on them. *See United States v. Rice*, 483 F.3d 1079, 1084 (10th Cir. 2007) (allowing such inquiries out of officer safety concerns); *United Stated v. Rivera*, 867 F.2d 1261, 1263 (10th Cir. 1989) (permitting such questions "regardless of [the officer]'s underlying motivation"). However, the officer's questioning in these cases occurred before the officer had reached the point where the investigatory stop presumptively should have ended. *See Rice*, 483 F.3d at 1081 (passengers questioned at outset of stop, before citations issued); *Rivera*, 867 F.2d at 1262 (same). Once an investigating officer has satisfied the initial purpose of an investigative stop, the detention generally must end, and the traffic stop itself can no longer serve as the justification for further inquiry into the identity or travel plans of a vehicle's occupants. *Cf. United States v. McSwain*, 29 F.3d 558, 561-62 (10th Cir. 1994) (finding a Fourth Amendment violation where an officer pulled over a driver for expired registration, discovered that the registration was valid as he approached the vehicle, but proceeded to extend the stop and question the driver and passenger). In short, though these cases authorize police officers to question passengers during a lawful traffic stop, they do not vest an officer with authority to extend the passengers' detention so as to question them about matters unrelated to the initial purposes of the stop.

> **B.  Perez-Molina's Continued Detention and Officer Pio's Actions Were Justified by a Reasonable Suspicion That Perez-Molina Was in Violation of N.M. Stat. Ann. 60-7B-1(C).**

That said, further detention (and therefore further questioning) may be appropriate where, during the course of the traffic stop, the officer develops a new reasonable and articulable suspicion that a detained person has engaged in criminal activity. *See De La Cruz*, 703 F.3d at

1198 (citation omitted); *see also United States v. Clarkson*, 551 F.3d 1196, 1201 (10th Cir. 2009) (citation omitted); *Rosborough*, 366 F.3d at 1148. Here, the Government argues that Officer Pio developed a reasonable, articulable suspicion that Perez-Molina was violating New Mexico's law prohibiting a minor from buying, receiving, possessing, or allowing himself to be served any alcoholic beverages. *See* N.M. STAT. ANN. § 60-7B-1(C).

The facts before me, viewed in the totality of the circumstances, suggest that Officer Pio reasonably suspected that Perez-Molina might be in violation of N.M. STAT. ANN. 60-7B-1. Officer Pio testified that he originally believed Perez-Molina to be between eighteen and twenty-five years old. Even though Perez-Molina was twenty-three at the time, his appearance could be mistaken for someone under twenty-one, particularly considering the fact that the sun had set and it was already dark. Officer Pio could smell alcohol in the vehicle, and he knew from Chairez's statements that there were at least five other beers in the vehicle that could belong to any of its occupants. Although Chairez had claimed possession of a single open container of alcohol and had averred that the other containers were unopened, he did not clarify whether the other beers were in his or another passenger's possession. Given these facts, Officer Pio was operating on more than "an inchoate and unparticularized suspicion or hunch" that Perez-Molina was a minor in possession of alcohol by the time he had issued citations to Chairez and initiated his questioning of Perez-Molina. *See, e.g.*, *Chavez*, 660 F.3d at 1221 (citation omitted). Officer Pio therefore possessed a reasonable suspicion of criminal activity sufficient to extend Perez-Molina's detention beyond that point. *See De La Cruz*, 703 F.3d at 1198 (citation omitted); *Rosborough*, 366 F.3d at 1148.

From there, the second step of the relevant inquiry is easily resolved. Perez-Molina reasonably appeared to be under the legal drinking age and lacked identification, and Officer Pio

reasonably suspected that he possessed alcohol. Thus, Officer Pio was entitled to ask Perez-Molina questions regarding his identity and to run a background check, both to determine Perez-Molina's correct age and to reduce risks to his own safety. *See McSwain*, 29 F.3d at 561 (allowing queries regarding identification where an officer, at the time of the questioning, "still has some objectively reasonable articulable suspicion" that criminal activity has occurred or is occurring (citations and internal quotation marks omitted)); *see also, e.g.*, *United States v. Jenson*, 462 F.3d 399, 403-04 (5th Cir. 2006) (permitting an officer to run computer checks on any vehicle occupants during a detention based on reasonable suspicion); *United States v. Purcell*, 236 F.3d 1274, 1278 (11th Cir. 2001) (citations omitted) (holding that an officer, for reasons of safety, may run a background check on vehicle occupants); *United States v. Wood*, 106 F.3d 942, 945 (10th Cir. 1997) (same). For these reasons, therefore, Officer Pio was justified in extending Perez-Molina's detention and running a background check on him.

> C. *Perez-Molina's Continued Detention and Officer Pio's Actions Were Justified by a Reasonable Suspicion That Perez-Molina Was in Violation of 8 U.S.C. § 1326(a).*

Officer Pio's law enforcement database query suggested that Perez-Molina had violated 8 U.S.C. § 1326(a), which assigns criminal penalties under Title 18 of the United States Code to any alien who has been excluded, deported, or removed and who is found at any time in the United States. The possible database hit thus provided additional reasonable suspicion that Perez-Molina had engaged in criminal activity. Accordingly, it was appropriate for Officer Pio to expand his original investigation so as to determine whether a federal criminal offense had been committed. *See De La Cruz*, 703 F.3d at 1198 (citation omitted); *Clarkson*, 551 F.3d at 1201. His confirmation of the previously provided identifying information, as well as his questions seeking new information regarding Perez-Molina's middle name and tattoos, were also reasonably

related in scope to the circumstances justifying this detention, as Officer Pio's questions all pertained to identifying information listed in the database.

Perez-Molina makes much of the fact that the database hit did not include any instructions to detain him; instead, it called for the reviewing officer to confirm the hit with ICE and to arrange for an ICE detainer. (*See* Defense Ex. A.) Perez-Molina also notes Officer Pio's testimony that immigration enforcement was "not my job" as a NMSP officer, suggesting that Officer Pio's continued detention of Perez-Molina was therefore unjustified. This argument ignores the fact that a law enforcement officer with reasonable suspicion that criminal activity has occurred may lawfully extend a *Terry* stop to investigate the suspected crime, regardless of whether the criminal activity in question relates to immigration." *See, e.g.*, *Clarkson*, 551 F.3d at 1201; *United States v. Vasquez-Alvarez*, 176 F.3d 1294, 1296 (10th Cir. 1999) (recognizing the general authority of state law enforcement officers to investigate suspected violations of federal criminal law relating to immigration (citing, *e.g.*, *United States v. Salina-Calderon*, 728 F.2d 1298, 1301-02 & n.3 (10th Cir. 1984))).[2] Although not expressly instructed by the database hit to detain Perez-Molina, Officer Pio's detention and continued questioning of Perez-Molina, up until the time of the arrest, was thus within the scope of permissible activities in light of the information available to him at the time.

---

[2] Although the parties do not squarely raise this issue, I am aware that the Supreme Court's recent decision in *Arizona v. United States* noted the "constitutional concerns" that would be implicated if individuals were detained "solely to verify their immigration status." *See* --- U.S. ---, 132 S. Ct. 2492, 2509 (2012). Such language might have bearing on the continued validity of *Vasquez-Alvarez* and related precedent in some circumstances. However, those concerns are not present here. Perez-Molina's detention was not extended simply to verify his immigration status; rather, Officer Pio sought to investigate whether Perez-Molina had violated a federal criminal statute ("Reentry of removed aliens," 8 U.S.C. § 1326(a)) related to immigration enforcement, a situation that the Supreme Court expressly refused to address. *See id.* ("There is no need in this case to address whether reasonable suspicion of illegal entry *or another immigration crime* would be a legitimate basis for prolonging a detention . . . ." (emphasis added)). Accordingly, *Clarkson*, *Vasquez-Alvarez*, and other Tenth Circuit caselaw on extended detentions based on reasonable suspicion of criminal activity remain on point.

### D. Perez-Molina's Arrest Was Supported by Probable Cause

Perez-Molina primarily focuses his arguments on his detention prior to the time that Officer Pio handcuffed him and placed him in the back of his patrol car. However, because Perez-Molina also challenges his detention in general terms, I will briefly address the justification for his arrest[3] after his flight from Officer Pio.

The Fourth Amendment requires that an arrest be supported by probable cause. U.S. CONST. amend IV. "Probable cause is measured against an objective standard"; the fulcrum issue is "whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer." *United States v. Soto*, 375 F.3d 1219, 1222 (10th Cir. 2004) (citation omitted). A court will find that probable cause supported a defendant's arrest when the reasonably trustworthy facts and circumstances known to the officer would cause a reasonable man to believe that the defendant has committed or is committing an offense. *See United States v. Morgan*, 936 F.2d 1561, 1568 (10th Cir. 1991) (citations omitted).

Here, a lawful background check and communication with the dispatcher confirmed that a person with Perez-Molina's full name, date of birth, social security number, and identifying features was a previously deported felon whose presence in the United States would constitute a violation of 8 U.S.C. § 1326(a), a criminal offense. These reasonably trustworthy facts and circumstances, combined with Perez-Molina's flight after he apparently heard the dispatcher's confirmation, *see United States v. Cui Qin Zhang*, 458 F.3d 1126, 1128 (10th Cir. 2006) ("[A] defendant's flight is suggestive of wrongdoing." (citing *Illinois v. Wardlow*, 528 U.S. 119, 124

---

[3] At the suppression hearing, the Government conceded that Perez-Molina was effectively under arrest once he was handcuffed and put in the back of Officer Pio's patrol car. Given the prolonged period of detention at this point, Officer Pio's decision to handcuff him, and other restrictions on his liberty of movement, I would agree that Perez-Molina was under arrest for the remainder of the relevant period.

(2000)), and Perez-Molina's agitated behavior just before his flight, *see id.* (citation omitted) (recognizing that "nervous behavior," when considered with other evidence, may also suggest wrongdoing), would lead a reasonable man to believe that Perez-Molina had violated that statute. As such, probable cause existed to support Perez-Molina's arrest.[4] Therefore, the evidence gathered as a result of his arrest, including his fingerprints and his Alien File, need not be suppressed. *See United States v. Olivares-Rangel*, 458 F.3d 1104, 1113 (10th Cir. 2006) (citation omitted).

   *E. Conclusion*

   Until Officer Pio issued citations to Chairez, Perez-Molina's detention was justified by the underlying traffic stop. From that point until the database hit, Perez-Molina's continued detention was justified by a reasonable suspicion that he was a minor in possession of alcohol, and Officer Pio's questioning was reasonably related to the scope of this detention. Between the time of the database hit and Perez-Molina's arrest, his further detention was justified by the reasonable suspicion that he was a previously deported felon illegally present in this country, and Officer Pio's actions were reasonably related to the scope of this detention. Finally, Perez-Molina's subsequent arrest was supported by probable cause. As such, I recommend that the Court deny Perez-Molina's motion to suppress evidence on Fourth Amendment grounds.

## II.      Perez-Molina's Statements Regarding His Identity

   Perez-Molina also argues that the identifying information given in response to Officer Pio's questioning should be suppressed because the officer failed to inform him of his *Miranda*

---

[4] Although 8 U.S.C. § 1252c only calls for the arrest and detention of those suspected of violating 8 U.S.C. § 1326(a) after the arresting law enforcement officer receives confirmation of the defendant's immigration status from the Immigration and Naturalization Service (now ICE or CBP), the Tenth Circuit also recognizes an officer's authority to effect such an arrest as part of his inherent power to arrest for violations of federal law, notwithstanding the language of § 1252c. *See Vasquez-Alvarez*, 176 F.3d at 1296-97, 1300.

rights beforehand. The United States responds that the statements it will seek to introduce at trial were not the product of a custodial interrogation and should therefore be deemed admissible.[5]

"No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. CONST. amend V. To protect this right, *Miranda* establishes that a criminal defendant's responses to questions made while in custody cannot be introduced into evidence to establish his guilt unless he has been informed of certain rights. *See Berkemer v. McCarty*, 468 U.S. 420, 429 (1984) (citations omitted). When such responses are made outside of custodial interrogation, *Miranda* warnings are not required. *See, e.g.*, *United States v. Eckhart*, 569 F.3d 1263, 1275 (10th Cir. 2009). This custody requirement is distinct from the question of whether an investigative detention was reasonable under the Fourth Amendment. *United States v. Revels*, 510 F.3d 1269, 1273 (10th Cir. 2007) (citations omitted). The relevant inquiry is objective, resolved by determining whether a reasonable person in the suspect's position would have understood his position "as the functional equivalent of formal arrest." *Id.* (citing *Berkemer*, 468 U.S. at 442). The defendant bears the burden of establishing that he was subject to custodial questioning. *See United States v. Picone*, 560 F.2d 998, 1002 (10th Cir. 1977) (noting that burdens of production and proof generally rest on the movant in a suppression hearing).

For a suspect to be "in custody" for *Miranda* purposes, his "freedom of action [must be] curtailed to a degree associated with formal arrest." *See Berkemer*, 468 U.S. at 440 (citation and internal quotation marks omitted). By contrast, a *Terry* stop or its equivalent does not usually trigger the need for these warnings, as such a stop typically involves only a brief detention, no weapons or handcuffs, "a few questions relating to identity and the suspicious circumstances, and an atmosphere that is substantially less police dominated" than a custodial interrogation. *See*

---

[5] The Government stipulates that it will not introduce any statements obtained after Officer Pio handcuffed Perez-Molina and placed him in the patrol car. (*See* Doc. 28 at 13.)

*United States v. Perdue*, 8 F.3d 1455, 1464 (10th Cir. 1993) (quoting *Berkemer*, 468 U.S. at 439) (internal quotation marks omitted). However, when police officers "take highly intrusive steps to protect themselves from danger" during a *Terry* stop, the need for *Miranda* protections is triggered, as these factors make the situation more analogous to a formal arrest. *See id.* at 1465.

Here, the statements at issue were elicited from Perez-Molina by a single police officer, in full view of a public road, without the use of weapons or handcuffs. The statements were responses to "a few questions relating to identity," specifically concerning Perez-Molina's name, date of birth, social security number, and identifying tattoos, and each was given within the first three minutes of direct questioning. The entire encounter, from the time that Chairez's vehicle was pulled over until Perez-Molina's flight and subsequent arrest, lasted no more than twenty-two minutes, including fourteen minutes of interaction between Officer Pio and other persons; none of the statements at issue here were made after Perez-Molina's arrest. The circumstances here do not strike me as the sort of prolonged, "police-dominated" atmosphere in which *Miranda* is implicated; rather, they appear to be no more than a typical *Terry* encounter. For that reason, I conclude that Perez-Molina was not in custody for *Miranda* purposes.[6]

---

[6] Even if Perez-Molina had been subject to custodial interrogation, the responses at issue might nonetheless be admissible. The Fifth Amendment only protects an accused person from being compelled to provide the Government with "evidence of a testimonial or communicative nature." *Schmerber v. California*, 384 U.S. 757, 761 (1966). Thus, disclosure of one's name would appear to be "essentially a neutral act" that is not protected by the Fifth Amendment. *United States v. McCurdy*, 40 F.3d 1111, 1115 (10th Cir. 1994) (quoting *California v. Byers*, 402 U.S. 424, 431-32 (1971) (plurality)); *see also United States v. Lara-Garcia*, 478 F.3d 1231, 1235 n.3 (10th Cir. 2007) ("Questions about a person's identity are not unconstitutional even if identification of the person may help lead to the prosecution of that person for a crime." (citation omitted)). *But see Hiibel v. Sixth Judicial Dist. Ct. of Nev.*, 542 U.S. 177, 189 (2004) (accepting, for the sake of argument, that "[s]tating one's name may qualify as an assertion of fact relating to identity"). Questions regarding one's date of birth and social security number, which are "normally attendant upon arrest and custody," may similarly be outside of the Fifth Amendment's protection. *See United States v. Robles*, 313 F. Supp. 2d 1206, 1220 n.10 (D. Utah 2004) (citation omitted). However, because Perez-Molina has failed to establish that he was "in custody" for *Miranda* purposes when questioned, I need not resolve this question.

17

Perez-Molina's statements regarding his identifying characteristics were not the product of a custodial interrogation, and as such Officer Pio's failure to administer *Miranda* rights before eliciting these statements was permissible. Therefore, I recommend that the Court deny Perez-Molina's motion to suppress on Fifth Amendment grounds.

## CONCLUSION

The Government has established that Officer Pio's seizure of Perez-Molina was reasonable, and Perez-Molina has failed to show that his responses to the officer's questions were elicited in violation of *Miranda*. Accordingly, I recommend that the Court deny Perez-Molina's motion to suppress.

---

**THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the Proposed Findings and Recommended Disposition. If no objections are filed, no appellate review will be allowed.**

---

William P. Lynch
United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.